IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

SCOTT BRADY                                                                                          PETITIONER
ADC #610273

V.                                           NO. 5:08cv00147 SWW-JWC

LARRY NORRIS, Director,                                                                       RESPONDENT
Arkansas Department of Correction

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge Susan Webber Wright. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and two copies of your objections must be received in the office of the United States District Court Clerk no later than eleven (11) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

   1.   Why the record made before the Magistrate Judge is inadequate.

   2.   Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.     The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## **RECOMMENDED DISPOSITION**

Scott Brady, an Arkansas Department of Correction (ADC) inmate, brings this 28 U.S.C. § 2254 petition for writ of habeas corpus (doc. 2), challenging a prison disciplinary decision. Respondent filed a response and supporting exhibits (doc. 9), to which Petitioner replied (doc. 12). For the reasons that follow, the petition should be **denied**.

I.

Petitioner is serving a 168-month sentence in the ADC for aggravated robbery, imposed in April 2000 (doc. 2, at 6-9). In September 2007, he was housed in the ADC's Wrightsville Unit. On September 24, 2007, Lt. Maxie Foote prepared a major disciplinary report charging Petitioner with violations of ADC Rule 12-1 (failure to obey staff order), Rule 3-1 (out of place assignment), Rule 17-1 (any felony act or misdemeanor), Rule 16-1 (escape or attempt to escape), and Rule 2-6 (unauthorized contact with public). According to the charge, Lt. Foote received a phone call from Lt. T. Park at approximately 1:30 p.m.

on September 24, 2007,[1] reporting that Petitioner had left the National Cemetery where he was assigned on work-release. Two officers were sent to the National Cemetery to pick up Petitioner. When they returned him to the Wrightsville Unit, Lt. Foote started an investigation into the incident. He learned that Petitioner had left the compound and was not in his assigned area. He was observed talking to a female in a red car, out of his assigned area. (Resp't Ex. A, at 1 [doc. 9-2].)

At a disciplinary hearing on October 2, 2007, Petitioner's only statement was that he was in isolation on September 24, the incident date specified in the charge. The hearing officer noted that Petitioner was correct, but that the original disciplinary showed the incident date was September 20 and that September 24 was a typographical error. (Resp't Ex. B, at 1 [doc. 9-3].) He found Petitioner guilty of each of the charged rule violations, stating that he was relying on the charging officer's "F-1,"[2] "staff's written report" and "005's" (incident reports). (*Id.* at 1-2.) In addition to the formal charge's assertions, as set forth above, Lt. Foote's incident report stated that he interviewed Petitioner about the incident and that Petitioner said he was talking to a black woman in a red car, giving her directions about how to find a grave site, and that he never left the compound.[3] In the incident report, Lt. Foote also stated that he talked to Lester Henderson,[4] who said he was on top of a hill watching Petitioner, had been looking for him for some time, and saw him

---

[1] As explained later, this was a typographical error, with the incident actually occurring on September 20, 2007.

[2] This is a reference to the charging officer's report, Major Disciplinary Form F-831-1. *See* ADC Adm. Reg. 831 (portions submitted as Pet'r Ex. 12 [doc. 14, at 6]).

[3] The exhibits include a handwritten witness statement from Petitioner stating this (Resp't Ex. A, at 5), but it is unclear whether this statement was reviewed by the disciplinary hearing officer.

[4] A memo identifies Henderson as the maintenance supervisor at the cemetery. (*Id.* at 6.)

at a red car talking to a woman, off of the job site area. (Resp't Ex. A, at 11-12.) An incident report from Lt. Park stated that, when Petitioner was returned to the Wrightsville Unit, Park asked him if he left the job site and Petitioner said "if he would've left he would not have came back." (*Id.* at 9-10.)

As punishment, Petitioner received thirty days of punitive isolation and was reduced from Class I-C to Class IV. He also received sixty days of restriction on commissary, phone, recreation and visitation privileges. (Resp't Ex. B, at 1.) He appealed to the warden, then to the disciplinary hearing administrator, then to the ADC director, with the disciplinary decision being affirmed at all levels. (Pet'r Ex. 5 [doc. 2, at 14-18]; Resp't Ex. C, at 2-3 [doc. 9-4].)

In this federal habeas petition (doc. 2), his subsequent motion for summary judgment (doc. 13), and his other supporting filings (docs. 12, 14, 16), Petitioner alleges the disciplinary decision at issue violated his due process and equal protection rights under the Fifth and Fourteenth Amendments to the United States Constitution, and amounted to cruel and unusual punishment under the Eighth Amendment. As a result, he says the decision: unfairly deprived him of his Class I status for one year; restricted his opportunities for rehabilitation, work release participation, clemency, furloughs and eligibility to earn income; deprived him of visitation; and adversely affected his future eligibility for parole and early release. In support, he alleges numerous violations of the ADC policies regarding disciplinary proceedings, as set forth in ADC Adm. Reg. 831 (Pet'r Ex. 12 [doc. 14, at 5-15]): (1) the major disciplinary action was not approved by the chief security officer; (2) the charge does not include sufficient details and was not reported by someone with direct knowledge; (3) he did not receive a major disciplinary report within seventy-two hours of being locked up on disciplinary court review, and he did not receive a hearing within five

days; (4) witness statements were not disclosed to him; (5) he was not provided a copy of an extension; (6) the disciplinary was processed without a valid, timely extension; (7) the charge was "based on fabricated hearsay and falsification of state documentation"; and (8) the hearing officer improperly changed the incident date in the charge, and the change was affirmed in his administrative appeals. As relief, Petitioner seeks expungement of the disciplinary decision, reinstated class status, reassignment to another ADC work-release unit, and punitive damages.

II.

Respondent first argues that, because Petitioner does not challenge the fact or duration of his ADC confinement, his claims are simply challenges to the conditions of that confinement, cognizable only in a 42 U.S.C. § 1983 civil rights action. *See Muhammad v. Close*, 540 U.S. 749, 754-55 (2004) (where no good-time credits were eliminated by a prison disciplinary determination, that decision has no effect on the term of incarceration ordered by the prisoner's original criminal judgment of conviction and a prisoner challenging the decision "raise[s] no claim on which habeas relief could have been granted on any recognized theory"); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) (§ 1983 complaint "is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody"). In a later pleading (doc. 13, at 3), Petitioner asserts that he is bringing his claims under *both* § 2254 and § 1983. As a matter of judicial efficiency, the Court should liberally construe Petitioner's filings as invoking both remedies and should not dismiss on this basis. *See Petty v. Card*, 195 F.3d 399, 400 (8th Cir. 1999) (pro se habeas petitioner entitled to liberal construction of petition and supplemental pleadings).

Respondent next argues that Petitioner's claims should be dismissed without prejudice because he has failed to exhaust his state remedies by seeking judicial review of the disciplinary decision in state court. As explained below, Petitioner's claims lack substantive merit. There is no need to make him jump through the state-court hoops to exhaust a non-viable federal habeas claim. *See* 28 U.S.C. § 2254(b)(2) (habeas application "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

The Court will, therefore, proceed to Respondent's final argument: that Petitioner's due process claims lack substantive merit because no protected liberty interest was at stake due to the disciplinary decision and that, even if any liberty interest was implicated, he was afforded adequate due process protections.

III.

The thrust of Petitioner's claims is the violation of numerous provisions of the internal ADC policies regarding disciplinary proceedings. A federal court may issue a writ of habeas corpus only for a violation of the Constitution, laws or treaties of the United States. 28 U.S.C. §§ 2241(c), 2254(a). There is no federal constitutional interest in having state officers follow state law or prison officials follow prison regulations. *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003). Therefore, Petitioner's claims in this regard do not amount to a cognizable federal habeas claim. Additionally, a § 1983 claim cannot be premised on violations of state laws or state-agency regulations. *Ebmeier v. Stump*, 70 F.3d 1012, 1013 (8th Cir. 1995) (§ 1983 "guards and vindicates federal rights alone"). Regardless of whether any ADC rules or regulations have been violated, this Court is limited to determining whether a federal violation has occurred.

The Fourteenth Amendment to the United States Constitution, extending the due process protections of the Fifth Amendment, provides in part that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. As stated, the disciplinary sanctions imposed on Petitioner were class reduction, isolation, and restricted privileges, with no loss of accrued good-time credits. He contends that the disciplinary decision also adversely affected his opportunities for rehabilitation, work release participation, clemency, furloughs, job eligibility, and eligibility for parole and early release.

Protected liberty interests may arise from the Due Process Clause itself or from an expectation or interest created by state laws or policies. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). The Due Process Clause does not protect prisoners from every adverse change in their confinement and does not, itself, create a protected liberty interest in any particular prisoner classification or eligibility for rehabilitative programs, *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); in any particular job assignment, *Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002); in good-time credit for satisfactory behavior while in prison, *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974); in being free from transfer to "less amenable and more restrictive quarters" in the prison, *Hewitt v. Helms*, 459 U.S. 460, 468 (1983); or in the possibility of future parole or release before expiration of a validly imposed sentence, *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979).

Although an inmate has no federal due process right to participate in a work release program, he may, however, have a protectible liberty interest in *remaining* in a program, depending on the nature of the specific work release program. Where a work release participant has been released from institutional life to reside and work in the community, the participant's status is similar to that of a parolee, giving rise to a liberty interest and the

7


necessity of due process protections before being deprived of that interest. *Edwards v. Lockhart*, 908 F.2d 299, 300-03 (8th Cir. 1990). This is distinguishable from the situation here, where an inmate continues to reside in an institutional setting but is released into the community each day to participate in employment. *Id.* at 303; *Callendar v. Sioux City Residential Treatment Facility*, 88 F.3d 666, 668 (8th Cir. 1996). Therefore, Petitioner's removal from his work release job implicates no liberty interest inherent in the Due Process Clause itself.

Liberty interests arising from state law are limited to freedom from restraint which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," or to actions which "inevitably affect the duration of [a prisoner's] sentence." *Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995).

*Sandin* expressly recognized that disciplinary action by prison officials in response to a prisoner's misconduct "falls within the expected perimeters of the sentence imposed by a court of law." *Id.* at 485. Temporary segregation and restricted privileges as a result of disciplinary infractions are certainly a typical and expected component of prison life, do not "present a dramatic departure from the basic conditions of [an inmate's] sentence," and, in this case, could have no effect on the duration of Petitioner's term of confinement. *Id.* at 485, 487. *See Overton v. Bazzetta*, 539 U.S. 126, 137 (2003) (withdrawal of visitation privileges for limited period as means of effecting prison discipline is not dramatic departure from accepted standards for conditions of confinement); *Sandin*, 515 U.S. at 485-86 (thirty days of disciplinary segregation "did not work a major disruption in [a prisoner's] environment"); *Phillips*, 320 F.3d at 847 (thirty-seven days in isolation and restricted visitation, exercise and chapel privileges); *Portley-El v. Brill*, 288 F.3d 1063, 1065-66 (8th Cir. 2002) (administrative and disciplinary segregation); *Kennedy v.*

*Blankenship*, 100 F.3d 640, 642-43 (8th Cir. 1996) (thirty days in punitive isolation and restrictions in mail, telephone, visitation, commissary and personal possessions privileges).

Similarly, adjustments in classification status as a means of punishment, and the consequences of a lower classification level, are not the kind of "atypical and significant" deprivations that create a liberty interest under *Sandin*. Under the applicable Arkansas statutes, the Board of Corrections is granted broad discretion in prescribing rules and regulations "for the maintenance of good order and discipline" in the state correctional facilities, and in classifying ADC inmates according to "good behavior, good discipline, medical condition, job responsibilities, and involvement in rehabilitative activities." Ark. Code Ann. §§ 12-29-101, 12-29-103(a), 12-29-202(a)(3) (2003 & 2007 Supp.). Inmates may be reclassified "as often as the [classification] committee deems necessary ... to maintain good discipline, order, and efficiency at the units, facilities, or centers." *Id.* § 12-29-202(c). ADC officials are also granted broad discretion in determining an inmate's eligibility to participate in vocational, educational and rehabilitative activities within the prison system. *Id.* § 12-29-101(d)(2). In short, nothing in the Arkansas statutes provides a basis for finding a protected liberty interest in the classification level assigned to an inmate by prison officials, or in its effect on the inmate's eligibility for rehabilitative programs. *See Sanders v. Norris*, 153 Fed. Appx. 403, 404 (8th Cir. 2005) (unpub. *per curiam*) (ADC inmate has no constitutional right to particular prison classification); *Madewell v. Roberts*, 909 F.2d 1203, 1207 (8th Cir. 1990) (ADC inmate has no right to consideration of Class I status); *Strickland v. Dyer*, 628 F. Supp. 180, 181 (E.D. Ark. 1986) (because Arkansas law does not protect a prisoner's right to any particular classification and there is no federally protected right regarding classification, ADC prisoner could not

prevail on claim that he was deprived of due process due to disciplinary penalty of two-step class reduction).

Additionally, a class reduction, with no accompanying loss of accrued good-time credits, did not "inevitably affect" Petitioner's term of confinement under Arkansas law, as contemplated by *Sandin*. At most, the reduction in class status deprived him of the opportunity to earn future good-time credits. Based on their level of classification, ADC inmates may earn up to thirty days of "meritorious good time" for each month of incarceration, thereby reducing an inmate's "transfer eligibility date," *i.e.*, the date he becomes eligible for transfer from the ADC to less restrictive placement or supervision by the Department of Community Correction (DCC). Ark. Code Ann. §§ 12-29-201(a) & (f)(1), § 12-29-202(b)(1), 12-29-204; *see id.* § 16-93-1202(2), (4), (11) & (12) (defining terms regarding transfer eligibility). Inmates who are reduced to the lowest class (Class IV) as a result of disciplinary action "shall not be entitled to earn meritorious good time." *Id.* § 12-29-202(b)(2). All or part of an inmate's accrued good time may be taken away by the ADC for infraction of prison rules. *Id.* § 12-29-203(a). However, these statutes do not provide an absolute entitlement to good time, stating only that an inmate "*may* be entitled" to meritorious good time, *id.* § 12-29-201(a)(1), and that an inmate who maintains a high classification "*may* earn" credit toward reduction of his transfer eligibility date, *id.* § 12-29-202(b)(1).

Furthermore, the statutes plainly state that "[m]eritorious good time will not be applied to reduce the length of a sentence," *id.* § 12-29-201(d); and that transfer to DCC supervision "shall not be considered as a reduction of sentence," *id.* § 16-93-1302(d). Therefore, although good time affects the date that an inmate may become eligible for transfer to less restrictive conditions, which may include parole, it has no effect on the

length of the sentence imposed by the trial court. In *McKinnon v. Norris*, 231 S.W.3d 725 (Ark. 2006), the Arkansas Supreme Court rejected a prisoner's claim that the class reduction he received as a disciplinary penalty, which made him ineligible to gain credit for statutory meritorious good time, constituted the deprivation of a state-created liberty interest without due process. *Id.* at 728-30. The court stated: "[M]eritorious good time does not apply to reduce the length of a sentence. ... As a result, Arkansas has not created a liberty interest in good time under the constitutional analysis in *Wolff v. McDonnell*." *McKinnon*, 231 S.W.3d at 730; *see also Koontz v. Norris*, No. 08-75, 2008 WL 2310973, *2 (Ark. Sup. Ct. June 5, 2008) (unpub.) (no due process violation regarding prison disciplinary that resulted in segregation, loss of class status, and loss of good-time credits); *Bayless v. Beck*, No. 04-69, 2005 WL 1411656, *2 (Ark. Sup. Ct. June 16, 2005) (unpub.) (no due process claim regarding prison disciplinary proceedings because "Arkansas has not created a liberty interest in good time"). The state "retains the authority to interpret the scope and availability of any state-conferred right or interest." *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997).

Like the inmate in *McKinnon*, there is no evidence that Petitioner lost more than the *opportunity* to earn further good-time credits toward his transfer eligibility date until he was able to advance out of Class IV. Restricting this ability as a disciplinary sanction is a typical and not unexpected occurrence in the prison environment. Moreover, because awarding good-time credits is discretionary, only affects an inmate's transfer eligibility date, and does not reduce his sentence, it cannot be said that good-time ineligibility due to reduced class status inevitably affects the duration of an inmate's sentence, as contemplated by *Sandin*. Additionally, as stated, classification decisions are based on a variety of factors, aside from disciplinary penalties, and are subject to frequent adjustment throughout the period of

incarceration. The chance that one class reduction "will alter the balance is simply too attenuated to invoke the procedural guarantees of the Due Process Clause." *Sandin*, 515 U.S. at 487. Therefore, Petitioner's demotion to Class IV does not give rise to a protected liberty interest under federal or state law.

The indirect effect of his disciplinary infractions and lower classification level – termination of his work release participation – is not an unexpected consequence for violating prison rules, especially when the misconduct occurred in connection with his work release status. It was not an atypical or significant deprivation for him to return to the conditions of confinement of the sentence originally imposed, the same conditions as those ordinarily experienced by a large number of inmates on a daily basis. There is no indication in the record that the duration of his sentence was in any way affected by the revocation of his work release status. Therefore, no state-created liberty interest was implicated under *Sandin*. *See Callendar*, 88 F.3d at 668-70.

Furthermore, nothing in the Arkansas statutes governing parole creates anything more than a mere possibility of parole, and thus the statutes do not establish any right to release on parole which would invoke due process protection. *Pittman v. Gaines*, 905 F.2d 199, 201 (8th Cir. 1990); *Parker v. Corrothers*, 750 F.2d 653, 655-57 (8th Cir. 1984); *Robinson v. Mabry*, 476 F. Supp. 1022, 1023 (E.D. Ark. 1979); *see Board of Pardons v. Allen*, 482 U.S. 369, 378 n.10 (1987). Instead, the statutes place minimal limitations on the Board's discretion and provide that the Board "may" release an individual on parole when, in its opinion, there is a reasonable probability that he can be released without detriment to the community or himself. Ark. Code Ann. § 16-93-701(a)(1). The statutes also clearly provide for discretion on the part of the Board in formulating "all policies, rules, and regulations regarding parole," setting conditions for parole, and in determining if or

when a particular inmate will be paroled. *E.g., id.* §§ 16-93-206(a)(1) & (4), (e)(1) & (f), 16-93-1302. The Arkansas Supreme Court has emphasized the broad discretionary authority granted to the Board under the state's parole statutes. *Michalek v. Lockhart*, 730 S.W.2d 210, 211 (Ark. 1987); *see Dougan v. Ford*, No. 04-623, 2005 WL 2387576, *2 (Ark. Sup. Ct. Sept. 29, 2005) (unpub.) ("If the conditions [set by the Board] are too onerous, appellant could decline to accept the conditions set, and elect to serve out his sentence instead."); *see also Hamilton v. Brownlee*, 237 Fed. Appx. 114, 115 (8th Cir. 2007) (unpub.) (Arkansas parole statutes do not create protectible liberty interest in discretionary parole decisions, and prisoner did not have protectible liberty interest in having parole board follow its own hearing policy).

Finally, nothing in federal or Arkansas law creates a protected liberty interest in the discretionary grant of furloughs or clemency. *See Whitmore v. Gaines*, 24 F.3d 1032, 1034 (8th Cir. 1994) (Arkansas's clemency statute "does not create a constitutional right or entitlement sufficient to invoke the Due Process Clause"); *Nash v. Black*, 781 F.2d 665, 668 (8th Cir. 1986) (no liberty interest in discretionary furloughs); *Dukes v. Norris*, 256 S.W.3d 483, 486-87 (Ark. 2007) (no liberty interest in furlough under Arkansas law; ADC's grant of meritorious furlough is "highly discretionary").

When a prisoner is committed to the custody of a state penal authority, such as the ADC, "he can be assured of only one thing – that he will be released from the State's custody at the end of the term of years specified by the sentencing court." *Richmond v. Duke*, 909 F. Supp. 626, 631 (E.D. Ark. 1995). Petitioner has no federal or state liberty interest in the possibility of obtaining parole, furlough or clemency, or any type of early release, and he is thus not entitled to any due process protections in connection with diminishment of those possibilities.

Even if Petitioner were able to establish the existence of a protected liberty interest entitling him to procedural protections regarding the disciplinary decision at issue, the record shows that he was afforded adequate process. To comport with due process where a protected liberty interest exists in connection with a prison disciplinary proceeding, a prisoner must receive: (1) advance written notice of the disciplinary charges; (2) an opportunity to call witnesses and present a defense; and (3) a written statement of the evidence relied upon by the fact-finder and the reasons for the disciplinary action. *Wolff*, 418 U.S. at 563-67; *see also Edwards*, 908 F.2d at 303 (holding that similar minimum due process requirements must be met before revoking participation in a work release program similar to parole).

Due process also requires that the record contain "some evidence" to support the prison disciplinary decision. *Superintendent v. Hill*, 472 U.S. 445, 455-56 (1985). The relevant question "is whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455 (emphasis added). This "some evidence" rule allows the federal courts to defer to the judgment of prison officials in maintaining discipline in their institutions while meeting constitutional requirements. *Id.* at 456. This limited review by federal courts does not require examination of the entire record, independent assessment of credibility of witnesses, or weighing of the evidence. *Id.* at 455. Prison officials can permissibly rely on conduct violation reports to find inmates guilty of disciplinary infractions. *Id.* at 456; *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008); *Hrbek v. Nix*, 12 F.3d 777, 781 (8th Cir. 1993). They may also rely on hearsay. *Moore v. Plaster*, 313 F.3d 442, 444 (8th Cir. 2002). A report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as

"some evidence" upon which to base a prison disciplinary decision, if the violation is found by an impartial decision-maker. *Hartsfield*, 511 F.3d at 831.

Here, the disciplinary records reflect that Petitioner was notified of the disciplinary charges at 9:15 a.m. on September 28, 2007, eight days after the incident, four days after the disciplinary charge was written, and five days before the hearing date. (Resp't Ex. A.) At the disciplinary hearing on October 2, 2007, Petitioner pleaded not guilty to the charges and was allowed to make a statement. (Resp't Ex. B, at 1.) The incident reports also included statements made by Petitioner during the investigation, denying that he left the job site and explaining that he was simply giving directions to a woman looking for a grave site. (Resp't Ex. A, at 9-12.) The disciplinary hearing officer found Petitioner guilty of all charges. His written decision recited the factual basis for finding guilt and the evidence relied upon. He stated that he was accepting the reports of the charging officer and other staff over any information purporting to exonerate the inmate. (Resp't Ex. B.) Petitioner fully utilized all levels of the administrative appeal process. In his appeal to the warden, he again explained his actions and the reasons he believed the disciplinary charges to be unwarranted. (Pet'r Ex. 5 [doc. 2, at 14-18].) The procedures afforded to Petitioner were adequate to comport with the requirements of *Wolff* and *Hill*.

Petitioner's equal protection claim also fails because he has not demonstrated that similarly situated classes of inmates were treated differently, that any differential treatment bore no rational relation to a legitimate penal interest, or that he was subjected to intentional discrimination. *Phillips*, 320 F.3d at 848. Furthermore, the disciplinary sanctions did not violate the Eighth Amendment because they did not constitute unnecessary or wanton inflictions of pain, involve deprivations of "life's necessities," such

as water, food or shelter, or amount to deliberate indifference to Petitioner's health or safety. *Id.*; *see also Overton*, 539 U.S. at 136-37.

IV.

For the reasons set forth above, this 28 U.S.C. § 2254 petition for writ of habeas corpus (doc. 2) and Petitioner's motion for summary judgment (doc. 13) should be **denied**, dismissing this case in its entirety with prejudice.

DATED this 4th day of November, 2008.

_____
UNITED STATES MAGISTRATE JUDGE